Approved: _____
RUSSELL CAPONE
Assistant United States Attorney

**ORIGINAL**

**14 MAG 1315**

Before:    HONORABLE GABRIEL W. GORENSTEIN
           United States Magistrate Judge
           Southern District of New York

**DOC #** 1

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                    :    **SEALED COMPLAINT**

          - v. -                            :    Violations of 21 U.S.C.
                                                 § 846, 18 U.S.C. § 371
JOSE CARLOS PANIAGUA                        :
    a/k/a "Carlos,"                              COUNTY OF OFFENSE:
    a/k/a "Carlito,"                        :    BRONX
    a/k/a "Cee-lo,"
JOSE OSVALDO PANIAGUA JR.,                  :
    a/k/a "Osvaldo,"
    a/k/a "Calvo,"                          :
JOSE RAFAEL PANIAGUA,
    a/k/a "Rafaelito,"                      :
JOSE OSVALDO PANIAGUA SR.,
    a/k/a "Nano,"                           :
    a/k/a "Viejo,"
JOSE BORGEN-REYES,                          :
    a/k/a "Benny,"
    a/k/a "Benny Blanco,"                   :
    a/k/a "Scar," and
JOAN TORRES,                                :
    a/k/a "Ronco,"
                                            :
          Defendants.
                                            :

- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

          JAMES R. SIERPUTOWSKI, being duly sworn, deposes and
says that he is a Special Agent with the Federal Bureau of
Investigation ("FBI"), and charges as follows:

                         COUNT ONE

          1.    From in or about 2008, up to and including in or
about June 2014, in the Southern District of New York and

elsewhere, JOSE CARLOS PANIAGUA, a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo," JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," JOSE OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a "Viejo," JOSE BORGEN-REYES, a/k/a "Benny," a/k/a "Benny Blanco," a/k/a "Scar," and JOAN TORRES, a/k/a "Ronco," the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

2.    It was a part and an object of the conspiracy that JOSE CARLOS PANIAGUA, a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo," JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," JOSE OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a "Viejo," JOSE BORGEN-REYES, a/k/a "Benny," a/k/a "Benny Blanco," a/k/a "Scar," and JOAN TORRES, a/k/a "Ronco," the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

3.    The controlled substance that JOSE CARLOS PANIAGUA, a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo," JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," JOSE OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a "Viejo," JOSE BORGEN-REYES, a/k/a "Benny," a/k/a "Benny Blanco," a/k/a "Scar," and JOAN TORRES, a/k/a "Ronco," the defendants, conspired to distribute and possess with intent to distribute was mixtures and substances containing a detectable amount of oxycodone, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Section 846.)

### COUNT TWO

(Conspiracy to Commit Offenses Relating to the Misbranding, Adulteration and Unlawful Wholesale Distribution of Prescription Drugs)

4.    From at least in or about 2008, up to and including in or about June 2014, in the Southern District of New York and elsewhere, JOSE CARLOS PANIAGUA, a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo," JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," JOSE OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a

"Viejo," JOSE BORGEN-REYES, a/k/a "Benny," a/k/a "Benny Blanco," a/k/a "Scar," and JOAN TORRES, a/k/a "Ronco," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Sections 331(a), 331(t), 333(a)(2), 333(b)(1)(D), and 353(e)(2)(A) and (B) of Title 21, United States Code.

5.     It was a part and an object of the conspiracy that JOSE CARLOS PANIAGUA, a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo," JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," JOSE OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a "Viejo," JOSE BORGEN-REYES, a/k/a "Benny," a/k/a "Benny Blanco," a/k/a "Scar," and JOAN TORRES, a/k/a "Ronco," the defendants, and others known and unknown, willfully and knowingly, and with the intent to defraud and mislead, would and did introduce and deliver for introduction into interstate commerce a drug that was adulterated and misbranded, as those terms are defined in Title 21, United States Code, Sections 351(a) and 352(a), in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2).

7.     It was further a part and an object of the conspiracy that CARLOS PANIAGUA, a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo," JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," JOSE OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a "Viejo," JOSE BORGEN-REYES, a/k/a "Benny," a/k/a "Benny Blanco," a/k/a "Scar," and JOAN TORRES, a/k/a "Ronco," the defendants, and others known and unknown, willfully and knowingly would and did engage in the wholesale distribution in interstate commerce of prescription drugs subject to Title 21, United States Code, Section 353(b) in a State, at a time when the defendants and their coconspirators were not licensed by that State, in accordance with the guidelines issued under Title 21, United States Code, Section 353(e)(2)(B), in violation of Title 21, United States Code, Sections 331(t), 333(b)(1)(D), and 353(e)(2)(A) and (B).

## Overt Acts

8.     In furtherance of the conspiracy and to effect the illegal objects thereof, JOSE CARLOS PANIAGUA, a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo," JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," JOSE OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a "Viejo," JOSE BORGEN-REYES, a/k/a "Benny," a/k/a "Benny Blanco,"

3

a/k/a "Scar," and JOAN TORRES, a/k/a "Ronco," the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.     On or about April 19, 2012, in the Southern District of New York, JOSE BORGEN-REYES, a/k/a "Benny," a/k/a "Benny Blanco," a/k/a "Scar," possessed and transported prescription medication without a license.

b.     On or about December 17, 2012, in the Southern District of New York, JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," purchased prescription medication from another person who was not a licensed distributor.

c.     In or about March 2014, in the Southern District of New York, JOAN TORRES, a/k/a "Ronco," possessed a list of prescription medications and their sale price.

d.     In or about May 2014, in the Southern District of New York, JOSE CARLOS PANIAGUA, a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo," and JOSE RAFAEL PANIAGUA possessed and transported prescription medication without a license.

The bases for my knowledge and for the foregoing charges, are, in part, as follows:

9.     I am a Special Agent with the FBI.  I have been personally involved in the investigation of this matter.  This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals.  Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

BACKGROUND ON CRIMINAL MARKET IN SECOND-HAND PRESCRIPTION DRUGS

10.     Through my training, education, experience and participation in the investigation resulting in the filing of this complaint, I have become familiar with the following criminal market involving the unlawful diversion and trafficking

4

of prescription drugs, which previously had been dispensed in the New York City area to Medicaid recipients ("second-hand" drugs) in a national, underground market:

          a.    The prescription drugs involved in this scheme include both drugs of abuse, which typically contain the controlled substance oxycodone, and drugs designed to treat various illnesses, including, for example, HIV, schizophrenia, and asthma.   These second-hand drugs are originally dispensed to Medicaid recipients in the New York City area who then sell the drugs to others at locations like street corners and grocery stores in and around New York City.   The controlled substances such as oxycodone are then re-distributed like any other controlled substance.   The non-controlled substances, such as HIV medication, are sold into distribution channels that ultimately provide those same second-hand drugs to pharmacies to be re-sold to unsuspecting consumers and reimbursed again by Medicaid or other unsuspecting insurance companies.   Through the methods described herein, the participants profit by exploiting the difference between the cost to the patient of obtaining bottles of prescription drugs through Medicaid – which typically is zero – and the hundreds of dollars per bottle that pharmacies or individuals pay to purchase those drugs.   With respect to non-controlled substances, to reap maximum profits, the participants target the most expensive HIV medications, such as Atripla, Trizivir, and Truvada, which have Medicaid values in excess of $1,000 per bottle.

          b.    To effectuate the fraudulent scheme, the lowest level participants in the scheme (the "Medicaid Beneficiaries") fill prescriptions for month-long supplies of drugs at pharmacies throughout the New York City area, using Medicaid benefits to pay the cost.   The Medicaid Beneficiaries are typically AIDS patients or individuals who suffer from other illnesses and who sell their medications for cash rather than use them for treatment.   Medicaid Beneficiaries sell their bottles of drugs to other participants in the scheme ("Collectors") at locations like street corners and grocery stores in and around New York City.   With respect to non-controlled medication, Collectors sell the second-hand bottles they collect to other participants in the scheme ("Aggregators"), who typically buy large quantities of second-hand drugs from multiple Collectors.   The highest-level Aggregators involved in the scheme sell the second-hand non-controlled medication into distribution channels ultimately leading to pharmacies to be dispensed to unsuspecting consumers. Second-hand pills containing oxycodone are often redistributed

5

in black markets like any other controlled substance distributed illegally.

c.      Pharmacies originally dispense the drugs to Medicaid Beneficiaries in original, sealed, manufacturers' bottles. Each bottle comes from the manufacturer bearing a label (the "manufacturer's label") that indicates information about the drug. Prior to dispensing each bottle, pharmacies affix to the bottle, on top of the manufacturer's label, a separate, adhesive label ("patient label") that includes additional information, such as the name and address of the pharmacy, the name of the patient, information indicating that the drug was obtained through Medicaid, and dosage instructions. While Collectors often simply remove the pills containing controlled substances from the bottles to re-sell those pills, non-controlled substances are not removed from the bottles because the bottles will ultimately wind up back in pharmacies. Rather, Collectors and Aggregators use lighter fluid and other potentially hazardous chemicals to dissolve the adhesive on the patient labels, and remove the patient labels and all traces of the adhesive from the bottles. Through this process, the Collectors and Aggregators make the bottles appear new for the purpose of concealing the fact that they had already been dispensed, so that they eventually can be re-sold to unsuspecting consumers.

d.      In addition to constituting a fraud, the scheme is potentially dangerous to the unwitting consumers of second-hand prescription drugs. As described above, the bottles have been treated with potentially hazardous chemicals, and the drugs themselves may have expired. Additionally, the participants in the scheme store the drugs in uncontrolled conditions, which may not be sufficient to maintain the medical efficacy of such drugs over time. For example, some HIV medications require constant storage in conditions between 25 and 30 degrees Celsius to maintain their efficacy.

## THE JOAQUIN GROCERY & DELI AND THE CO-CONSPIRATORS

11.     Joaquin Grocery & Deli (hereinafter the "Joaquin Grocery") is a convenience store located at 598 Morris Avenue between 150th and 151st Streets in the Bronx, New York. Based on my review of publicly available information from the New York Department of State, I know that the Joaquin Grocery is owned by "Joaquin Grocery & Deli Inc.," whose listed chief executive officer is a woman I believe to be the wife of JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," the defendant.

6

12.    As set forth in more detail below, for at least the last six years, in addition to selling grocery items, the Joaquin Grocery has operated as a marketplace for Medicaid Beneficiaries to sell their second-hand medication, including HIV medication and pills containing oxycodone, for a profit, as a participant in the criminal business described above in paragraph 10.   The medication is aggregated in bulk quantities by the Paniagua Family (which, as defined and described below, runs the Joaquin Grocery), transferred to stash locations, and ultimately redistributed.

13.    Also as set forth in more detail below, the drug trade at the Joaquin Grocery has generated numerous acts of violence inside the Joaquin Grocery and in its immediate vicinity, including violence directed at certain of the defendants as a result of the Joaquin Grocery's success in the drug trade.

14.    The Joaquin Grocery is run on a daily basis by the Paniagua Family and their co-conspirators.[1]   Specifically, and as described in more detail below, the defendants currently play or have played the following roles:

a.    JOSE CARLOS PANIAGUA, a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo," JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," and JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," the defendants, are brothers who are responsible for the day-to-day drug trade at the Joaquin Grocery.   JOSE CARLOS PANIAGUA and JOSE RAFAEL PANIAGUA are responsible for the day-to-day operations, including the drug business, from the morning opening through approximately 2 p.m., at which point all prescription drugs purchased to that point in the day are typically moved from the store to a stash location by car.   JOSE OSVALDO PANIAGUA JR. is responsible for the purchase of prescription medication at the Joaquin Grocery from approximately 2 p.m. until close of business, at which point the medication purchased during that time period is typically moved from the store to a stash location by car.

---

[1] References to the "Paniagua Family" herein refer to each of JOSE CARLOS PANIAGUA, a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo," JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," and JOSE OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a "Viejo," the defendants.

7

b.    JOSE OSVALDO PANIAGUA SR., a/k/a "Nano,"
a/k/a "Viejo," the defendant, is the father of each of the
brothers referenced in paragraph (a) above, and assists in the
purchase of prescription medication at the Joaquin Grocery.

c.    JOSE BORGEN-REYES, a/k/a "Benny," a/k/a
"Benny Blanco," a/k/a "Scar," the defendant, was employed by the
Paniagua family inside of the Joaquin Grocery until
approximately the fall of 2012.   BORGEN-REYES's role was to
purchase prescription medication and transport prescription
medication, as well as to provide armed security and operate as
a lookout.

d.    JOAN TORRES, a/k/a "Ronco," the defendant,
replaced BORGEN-REYES in late 2012.   TORRES's role is to
purchase prescription medication and transport prescription
medication, as well as to provide armed security and operate as
a lookout.

DRUG TRAFFICKING AT THE JOAQUIN GROCERY FROM 2008 THROUGH 2012

15.    This investigation has involved the use of three
cooperating witnesses for the Government ("CW-1," "CW-2," and
"CW-3").   Each of CW-1, CW-2, and CW-3 has pleaded guilty to
crimes, including crimes related to the purchase and
redistribution of oxycodone and HIV medication, among other
offenses, pursuant to cooperation agreements with the
Government, and each is providing information to the Government
in the hope of obtaining leniency when they are sentenced.
Information provided by CW-1, CW-2 and CW-3 has proven reliable
and has been corroborated by independent evidence.

16.    Based on information provided by CW-1, I learned
the following:

a.    From at least 2008 up to and including
October 2011, when CW-1 was arrested, CW-1 was involved in the
purchase of HIV medication, Oxycontin, and Percocet from
Medicaid Beneficiaries and others in the Bronx for re-sale to
others.[2]   In terms of HIV medication, CW-1 purchased and sold
millions of dollars' worth of such medication to multiple
Aggregators in the New York City area.

---

[2] Based on my training and experience, I know that Percocet and
Oxycontin are brand names for prescription drugs that contain
the controlled substance oxycodone.

b.    Typically, CW-1 and his co-conspirators would remove the patient labels from the medication bottles using lighter fluid before re-selling them.  CW-1 did this so that when the medication bottles were ultimately sold back to pharmacies, they would appear new and not as if they had been bought and sold on the street.

c.    CW-1 first became involved in the business of purchasing and redistributing prescription medication by working with a co-conspirator not named herein ("CC-1").  CC-1 purchased prescription drugs at the Joaquin Grocery for JOSE CARLOS PANIAGUA, a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo."  In addition to purchasing prescription medication, CC-1 would transport the medication to a stash-house maintained by the Paniagua Family on 151st Street nearby the Joaquin Grocery.

d.    Beginning in 2008, CC-1 provided CW-1 with lists of medications and their prices so that CW-1 could assist buying medications from Medicaid Beneficiaries.

e.    CW-1 spent time in the stash-house operated by CC-1 for the Paniagua Family during the 2008-2010 time period.  The stash-house was in an apartment in a complex within a couple blocks of the Joaquin Grocery.

f.    Through CC-1, CW-1 met JOSE CARLOS PANIAGUA, JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," and JOSE OSVALDO SR., a/k/a "Nano," a/k/a "Viejo," the defendants, who CW-1 knew to run the Joaquin Grocery, as well as JOSE BORGEN REYES, a/k/a "Benny," a/k/a "Benny Blanco," a/k/a "Scar," the defendant, who worked for the Paniagua Family.  CW-1 would sometimes sell the prescription medication he purchased to JOSE CARLOS PANIAGUA, JOSE RAFAEL PANIAGUA, JOSE OSVALDO PANIAGUA SR., or BORGEN-REYES.

g.    CW-1 has seen JOSE CARLOS PANIAGUA, JOSE RAFAEL PANIAGUA, JOSE OSVALDO PANIAGUA SR. and BORGEN-REYES purchasing HIV medication, Percocet, and Oxycontin inside of the Joaquin Grocery.  Medication sales inside of the Joaquin Grocery typically tookx place in a small room behind a door at the back of the store.  Typically, during these purchases, the individual that made the purchase first attempted to remove the patient label with lighter fluid before agreeing to purchase the medication.

9

h.     Around 2009, CW-1 began purchasing prescription medication in the same vicinity as the Joaquin Grocery.  After CW-1 became more established purchasing medication in that area, he had several conversations with JOSE CARLOS PANIAGUA over what prices they should charge on the block for various medications to avoid a price war.  CW-1 understood JOSE CARLOS PANIAGUA to be the "boss" of the prescription drug business at the Joaquin Grocery.

i.     Ultimately, beginning around 2010, tension developed between CW-1 and the Paniagua Family because CW-1 was targeting the same Medicaid Beneficiary customers who sold their prescription drugs to the Joaquin Grocery.  Tension also developed between a co-conspirator of CW-1 ("CC-2") and the Paniagua Family.  CC-2 would stand outside of a different convenience store on the same block as the Joaquin Grocery ("Store-1") to poach Medicaid Beneficiaries before they were able to sell their medication to the Joaquin Grocery.

j.     At some point in 2010, a large, muscular individual approached CW-1 and said he had been sent by JOSE CARLOS PANIAGUA and that CW-1 needed to leave the area.  After that point, CW-1 started purchasing prescription medication at another location several blocks away.  CC-2, however, continued to purchase prescription medication at Store-1.

k.     Around this time, CC-2 was shot in front of a store a couple doors down from the Joaquin Grocery where he was waiting to purchase prescription medication.  CC-2 told CW-1 that a male had approached him and pulled out a gun, before shooting him in the head.  CC-2 was then carried to Lincoln Hospital, which is nearby the Joaquin Grocery.

l.     After CC-2's shooting, CW-1 and another one of his partners ("CC-3") continued to have arguments with JOSE CARLOS PANIAGUA over customers in the vicinity of the Joaquin Grocery.  On one occasion, after an argument, CW-1 was present when CC-3 smashed the windows of JOSE CARLOS PANIAGUA's Mercedes Benz with a bat.  Later that day, JOSE CARLOS PANIAGUA called CW-1 and CC-3, and told them, in substance, that "you know what I did to [CC-2]," and that they would not know in advance when they would get "hit."

m.     Also around this time, JOSE OSVALDO PANIAGUA JR. and BORGEN-REYES approached CW-1 and CC-3 in an attempt to resolve the dispute.  However, CC-3 and BORGEN-REYES began arguing, and BORGEN-REYES pulled out a gun and pointed it at CC-

10

3. CW-1 held CC-3 back, and JOSE OSVALDO PANIAGUA JR. held BORGEN-REYES back.

n. Around this time, CW-1 and CC-2 paid an individual to have JOSE CARLOS PANIAGUA killed, but the person they paid was unsuccessful in locating JOSE CARLOS PANIAGUA to perform the shooting.

o. Despite these disputes, in 2011, CW-1 began purchasing a significant quantity of HIV medication, Oxycontin, and Percocet from JOSE OSVALDO PANIAGUA JR.

p. Ultimately, CW-1 and CC-2 themselves had a falling out over their prescription drug business. In the fall of 2011, CW-1, CC-3, and another co-conspirator not named herein ("CC-4") offered another individual $2,000 to kill CC-2.

17. Based on my review of reports from the New York City Police Department and my discussion with an NYPD Detective, I learned that CC-2 was the victim of a shooting on October 13, 2010, as indicated by CW-1. Specifically, I learned the following:

a. At approximately 11:00 a.m. that day, CC-2 was standing outside of 586 Morris Avenue with two other individuals, which is a few stores down from the Joaquin Grocery on Morris Avenue in the Bronx.

b. A male approached CC-2 and shot him twice, once to the left side of the head and once to the torso.

c. CC-2 was transported to Lincoln Hospital, and ultimately survived.

d. Two .22 caliber shell casings were found at the scene.

18. Based on my discussions with CW-2, I learned the following:

a. CW-2 was brought into the business of purchasing HIV medication, Percocet and Oxycontin by CW-1 and CC-2. From 2010 to 2012, CW-2 purchased medication from Medicaid Beneficiaries on the street in the Bronx, removed the patient labels from the medication if it was HIV medication, and re-sold it to CW-1, CC-2, and others. CW-2 purchased the

11

medication in the vicinity of the Joaquin Grocery, and spent time in the Joaquin Grocery.

b.      During the same time period, CW-2 began purchasing Percocet from individuals at the Joaquin Grocery for redistribution.  Specifically, CW-2 purchased Percocet from JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," and JOSE OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a "Viejo," the defendants.  CW-2 also purchased Oxycontin from JOSE BORGEN-REYES, a/k/a "Benny," a/k/a "Benny Blanco," a/k/a "Scar," the defendant.  The oxycontin was first provided to CC-2, who then provided it to CW-2.

c.      While spending time at and around the Joaquin Grocery, CW-2 regularly saw JOSE CARLOS PANIAGUA, a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo," the defendant, standing at a restaurant at the corner of 150th Street and Morris Avenue, nearby the Joaquin Grocery, appearing to direct Medicaid Beneficiaries to the Joaquin Grocery.

d.      From spending time inside of the Joaquin Grocery, CW-2 is aware that the transactions took place in a small room behind a door at the back of the store.

e.      CW-2 is aware of the 2010 shooting of CC-2.  CC-2 told CW-2 that he was shot as a result of stealing prescription medication suppliers on the block where the Joaquin Grocery is located.

19.     Based on my discussions with CW-3, I learned the following:

a.      CW-3 was involved in the purchase of prescription medication, including HIV medication, Oxycontin, and Percocet, on the same block as the Joaquin Grocery.  CW-3 worked at Store-1, and observed CC-2 purchasing prescription drugs outside of Store-1 on numerous occasions.  CW-3 understood CC-2 to be stealing the Joaquin Grocery's illegal prescription drug suppliers.

b.      CW-3 is aware that CC-2 was shot on the same block as the Joaquin Grocery and Store-1.  CC-2 told CW-3 that he was "chased away" from the neighborhood by the individuals at the Joaquin Grocery and Store-1.  In the months leading up to the shooting, CW-3 saw JOSE OSVALDO PANIAGIA JR., a/k/a "Osvaldo," a/k/a "Calvo," and JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," the

12

defendants, regularly arguing with CC-2 on the street near the Joaquin Grocery and demanding that he leave the street.

           c.    On several occasions in 2011 and 2012, CW-3 steered Medicaid Beneficiaries to the Joaquin Grocery so that they could sell their prescription medication, including HIV medication and Percocet. CW-3 has observed JOSE OSVALDO PANIAGUA JR., JOSE OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a "Viejo," and JOSE RAFAEL PANIAGUA, the defendants, purchasing such medication inside of the Joaquin Grocery. The transactions typically took place in a small room located in the rear of the store.

           d.    Between approximately 2010 and 2012, CW-3 regularly saw JOSE BORGEN-REYES, a/k/a "Benny," a/k/a "Benny Blanco," a/k/a "Scar," transport bags of prescription medication from the Joaquin Grocery to his car before driving away.

           e.    Beginning at some point in 2012, JOAN TORRES, a/k/a "Ronco," the defendant, worked security at the Joaquin Grocery. CW-3 also observed TORRES consummating prescription drug transactions in the back of the Joaquin Grocery. TORRES showed CW-3 a gun that TORRES told CW-3 was given to him by the owners of the Joaquin Grocery to guard the store. According to TORRES, when he is not working, the gun is stored in the basement of the Joaquin Grocery.

           f.    CW-3 has observed the pills being removed from the Joaquin Grocery and brought to various vehicles used by the Paniagua Family, before being driven away. The pills are brought to the vehicles in grocery bags by various individuals, including TORRES and, as noted above, previously BORGEN-REYES.

           20.    Based on my review of arrest and complaint records from the NYPD and my discussions with various officers of the NYPD, I know the following:

           a.    On or about February 18, 2009, on the corner of Morris Avenue and 150th Street in the Bronx (i.e., the street on which the Joaquin Grocery is located), an NYPD Officer observed JOSE CARLOS PANIAGUA, a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo," the defendant, appear to hand cash to another individual, who then handed JOSE CARLOS PANIAGUA a black plastic bag. JOSE CARLOS PANIAGUA then placed the black plastic bag on the ground. JOSE BORGEN-REYES, a/k/a "Benny," a/k/a "Benny Blanco," a/k/a "Scar," the defendant, then picked up the black plastic bag and placed it in a nearby car. Officers then stopped JOSE CARLOS PANIAGUA, BORGEN-REYES, and the third

13

individual, and searched the car.  Inside of the black plastic
bag was approximately $4,000 worth of prescription medication.

b.    On or about April 19, 2012, an NYPD Officer
("Officer-1") observed BORGEN-REYES leave the Joaquin Grocery
carrying a black plastic bag, get into the front driver's side
of a black Mercedez Benz, and appear to light and begin smoking
a marijuana cigarette.  BORGEN-REYES then pulled away.  Officer-
1 pulled BORGEN-REYES over several blocks later and seized the
black plastic bag.  Inside of the black plastic bag were a large
quantity of Endocet pills, which I know from my training and
experience contain oxycodone.

## DECEMBER 30, 2011 GUNPOINT ROBBERY OF PRESCRIPTION DRUGS PURCHASED AT THE JOAQUIN GROCERY

21.    Based on my review of NYPD arrest paperwork and
my discussions with an NYPD Officer ("Officer-2"), I learned the
following:

a.    Shortly after 1 p.m. on or about December
30, 2011, JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," the
defendant, contacted the NYPD and reported that he had just been
robbed.  Specifically, JOSE RAFAEL PANIAGUA stated that as he
was standing on 151st Street between Morris Avenue and Cortland
Avenue in the Bronx (which is around the corner from the Joaquin
Grocery), two men (the "Assailants") got out of a white minivan
and approached him.  One of the Assailants pointed a gray
firearm at JOSE RAFAEL PANIAGUA and a second individual and
demanded that JOSE RAFAEL PANIAGUA and the other individual give
him their money, cell phone, and keys.  According to JOSE RAFAEL
PANIAGUA, he handed his jacket to the Assailants, and the other
individual handed personal property to the Assailants.  The
Assailants then got back into the white minivan, which drove
away.

b.    Shortly after JOSE RAFAEL PANIAGUA reported
the robbery, a white Toyota minivan (the "Toyota") was stopped
by NYPD Officers a few blocks away from the Joaquin Grocery.
Just as the Toyota was stopped, a male got out of the Toyota and
ran away.  Two other males were inside of the car and were
placed under arrest, along with the male who had run away.
Inside of the Toyota was a loaded .380 caliber pistol, a jacket,
two cellular telephones, cash, and various bottles of
prescription drugs containing more than 1,000 pills.  The pills
included HIV medications such as Atripla and Truvada, as well as

14

medications that contained controlled substances such as
Suboxone and Endocet.

            c.    JOSE RAFAEL PANIAGUA identified the two men
found in the Toyota as the Assailants.  JOSE RAFAEL PANIAGUA
also identified one of the recovered cellphones in the Toyota as
his own, and the recovered jacket as his own.

            22.   Subsequent to the robbery described in paragraph
21 above, other FBI agents took custody of the prescription drug
bottles seized from the Toyota.  Based on my discussion with one
of those agents ("Agent-1"), I learned that many of the bottles
had patient labels on them indicating that they had been
dispensed by pharmacies to Medicaid Beneficiaries.  Agent-1 then
contacted some of the Medicaid Beneficiaries who were listed as
the patients on some of those bottles.

            23.   In particular, Agent-1 interviewed a Medicaid
Beneficiary ("Beneficiary-1") whose name was on one of the
prescription drug bottles found in the Toyota.  From discussing
this interview with Agent-1, I learned that Beneficiary-1 stated
the following:

            a.    Beneficiary-1 has spent time in and around
the Joaquin Grocery and is aware that individuals sell their
medication there.

            b.    Beneficiary-1 identified a photograph of
JOSE OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a "Viejo," the
defendant, as someone who works at the Joaquin Grocery, and that
"everyone knows if you want something, to see him."

            c.    Beneficiary-1 identified a photograph of
JOSE OSVALD PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," the
defendant, as "one of the collectors of pills" who purchases and
inspects pills inside the Joaquin Grocery.

            d.    Beneficiary-1 once sold medication to the
Joaquin Grocery through another individual.

            24.   Agent-1 interviewed another Medicaid Beneficiary
("Beneficiary-2") whose name was on one of the prescription drug
bottles found in the Toyota.  From discussing this interview
with Agent-1, I learned that Beneficiary-2 stated the following:

            a.    Beneficiary-2 was a drug addict who was
attending a methadone program.

b.      Beneficiary-2 obtained medication from a
pharmacy, including Cymbalta, which he resold at the Joaquin
Grocery.  Beneficiary-2 also sold others' medication inside of
the Joaquin Grocery.  On those occasions, Beneficiary-2 would
bring the person to the store, but would consummate the
transaction on his/her own because Beneficiary-2 knew the
individuals who worked in the Joaquin Grocery.  Beneficiary-2
would also get a "cut" of the profit from each of these sales.

c.      Beneficiary-2 identified photographs of JOSE
OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a "Viejo," and JOSE
OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," the
defendants, as family members who work at the Joaquin Grocery
and to whom Beneficiary-2 has sold prescription drugs.
Beneficiary-2 stated, in substance, that if you are looking to
sell your prescription medication, all you have to do is enter
the Joaquin Grocery and make eye contact with whoever is working
behind the counter; if that person recognizes you, he will
follow you to the rear of the store to conduct the transaction.

d.      When Beneficiary-2 sold his/her Cymbalta, he
sold it to the person depicted in the photograph of JOSE OSVALDO
PANIAGUA JR.  JOSE OSVALDO PANIAGUA JR. did not want to buy the
Cymbalta and said he was looking to buy "oxy," but bought it
anyway because he knew Beneficiary-2 and Beneficiary-2 brought
him customers.

## 2012 THROUGH THE PRESENT: CONTINUED DRUG BUSINESS AND VIOLENCE AT THE JOAQUIN GROCERY

25.     On or about December 17, 2012, Agent-1 met with
Beneficiary-2 and equipped him with a video recording device and
an audio recording device.  Agent-1 then conducted surveillance
in the vicinity of the Joaquin Grocery, and observed
Beneficiary-2 speaking with others outside of the Joaquin
Grocery and ultimately entering the Joaquin Grocery.  Based on
my review of the video and audio recordings, my review of a
transcript of the recordings that has been translated from
Spanish to English, and my discussions with Agent-1, including
with respect to his debriefing of Beneficiary-2, I learned the
following:

a.      While standing outside of the Joaquin
Grocery, Beneficiary-2 observed an elderly woman ("Beneficiary-
3") with a cane get out of a car that pulled up.  Beneficiary-2

16

knew Beneficiary-3 to be a woman who had previously sold her prescription medication to the Joaquin Grocery.

           b.    Beneficiary-2 then followed Beneficiary-3 into the Joaquin Grocery, while speaking with her.

           c.    JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," and JOAN TORRES, a/k/a "Ronco," the defendants, among others, were inside of the Joaquin Grocery.  TORRES was sitting outside of a closed door in the back of the Joaquin Grocery, which Beneficiary-2 knew to be the door leading to the small room where prescription drug transactions are typically consummated.

           d.    Beneficiary-2, Beneficiary-3, and JOSE RAFAEL PANIAGUA then went into the small room behind the door.

           e.    Beneficiary-3 sold JOSE RAFAEL PANIAGUA a bottle of Percocet pills.

           f.    JOSE RAFAEL PANIAGUA and Beneficiary-2 then discussed "white ones" and "yellow ones."  JOSE RAFAEL PANIAGUA indicated that "the people who buy from us" want the "yellow ones."

           g.    JOSE RAFAEL PANIAGUA told Beneficiary-2 that he was "paying it at 3."

           26.    Based on my training, experience, participation in this investigation, and discussion with Agent-1 regarding his debriefing of Beneficiary-2, I believe that during the recording discussed in paragraph 26 above, JOSE RAFAEL PANIAGUA purchased a bottle of Percocet from Beneficiary-3, and then discussed sales of Percocet with Beneficiary-2, including a price of $3 per pill.  I know that Percocet pills are commonly referred to as "yellow ones" because the pills are yellow in color.

           27.    In or about January 2013, the FBI placed a pole camera across the street from the Joaquin Grocery.  The pole camera has recorded footage from that point to the present. Based on my review of numerous days of footage from the pole camera between January 2013 and the present, I learned the following:

           a.    JOSE CARLOS PANIAGUA JR., a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo," JOSE OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a "Viejo," and JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," the defendants, are regularly at the Joaquin

Grocery in the morning through approximately between two and three in the afternoon. JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," the defendant, is regularly at the Joaquin Grocery from approximately two in the afternoon through closing. JOAN TORRES, a/k/a "Ronco," the defendant, is regularly at the Joaquin Grocery throughout the day.

b.     On a regular basis, typically between 2:00 p.m. and 2:30 p.m., one of the above-referenced individuals walks a grocery bag or bags to one of three vehicles (the "Vehicles") parked outside of the Joaquin Grocery. Typically, either JOSE CARLOS PANIAGUA, JOSE RAFAEL PANIAGUA, or TORRES walks the bag or bags to the Vehicle during this hour. If JOSE CARLOS PANIAGUA, JOSE RAFAEL PANIAGUA walks the bag or bags to the Vehicle, TORRES typically walks with the person or stands just outside the Joaquin Grocery and looks around.

c.     After the bag or bags are brought to the Vehicle, the Vehicle is typically driven away.

d.     On a regular basis, between 6:00 p.m. and 8:00 p.m., either JOSE OSVALDO PANIAGUA JR. or TORRES walks a grocery bag or bags to one of the Vehicles parked outside of the Joaquin Grocery. After the bag or bags are brought to the Vehicle, the Vehicle is typically driven away.

28.     Based on my review of information from the New York State Department of Motor Vehicles, I know that two of the Vehicles are registered to the wife of JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," the defendant, who, as noted above in paragraph 11, is the listed chief executive officer of the "Joaquin Grocery & Deli Corp." The third vehicle is registered to JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," the defendant.

29.     On or about March 6, 2014, late at night, I retrieved three bags of trash from the public street outside of the Joaquin Grocery. I then searched the three bags, and discovered, among other things, the following:

a.     An empty amber prescription bottle for Oxycodone HCL 30mg;

b.     A pharmacy printout and prescription label for an Oxycodone HCL 30mg prescription;

c.     A prescription for fluticasone, which is a

18

nasal spray.

            d.    What appears to be a list of prescription medications, with the name "Ronco" on top.  Specifically, the paper reads as follows:

Ronco

| 119 | AZ       | 16.5 | 1963 |
|-----|----------|------|------|
| 85  | AM       | 4.5  | 382  |
| 107 | BLANCA   | 3    | 321  |
| 2   | SUBOXI   | 45   | 90   |
| 1   | INSESTRE | 30   | 30   |
| 1   | TRUVADA  | 30   | 30   |
| 120 | ACQ      |      | 1700 |

Customer Order Number
5100

WIC – 80

            30.  Based on my training, experience, and participation in this investigation, I believe that the list referenced in paragraph 29 above is a list of either medication purchased by the Joaquin Grocery on a particular occasion or sold by the Joaquin Grocery to another individual.  I know that "Truvada" is an HIV medication.  I also believe "Insestre" to be a reference to the HIV medication "Isentress."  Further, I believe "AZ" to reference "azul," which is Spanish for blue, and is often used as a code for blue Oxycontin 30mg pills; "am" to reference "amarilla," which is Spanish for yellow, and is often used as a code for yellow Percocet 10mg pills; and "blanca," which is Spanish for white, to be a reference to white Oxycontin 10mg pills, which are often referred to as "white ones." Finally, I believe that "Suboxi" references Suboxone.

            31.  Based on my review of reports prepared by the NYPD and my discussions with an NYPD Detective ("Detective-1"), I know that on or about March 27, 2014, an armed robbery was reported inside of the Joaquin Grocery.  After the robbery, JOSE OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a "Viejo," and JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," the defendants, spoke to Detective-1.  JOSE OSVALDO PANIAGUA SR. was interviewed at the hospital, and JOSE RAFAEL PANIAGUA was interviewed at an NYPD precinct.  Specifically, based on my discussions with Detective-1, I learned the following:

19

a.       JOSE OSVALDO PANIAGUA SR. stated, in sum and
in substance, that approximately 10:00 a.m. that day, three
males entered the Joaquin Grocery carrying guns.  One of the
males fired one shot that struck JOSE OSVALDO PANIAGUA SR. in
the arm and then pushed JOSE OSVALDO PANIAGUA SR. to the ground.
The two other males proceeded to the rear of the store, where
they sprayed mace in the face of JOSE OSVALDO PANIAGUA SR.'s
son, JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," the defendant, and
nephew.  The three men then duct-taped the hands of JOSE OSVALDO
PANIAGUA SR., his nephew, and his son Jose.  They took money
from the cash register as well as from JOSE OSVALDO PANIAGUA SR.
and his nephew.

b.       JOSE RAFAEL PANIAGUA provided an account of
the robbery that was largely consistent with JOSE OSVALDO
PANIAGUA SR.'s account.  At the time of his interview at the
precinct on March 27, 2014, JOSE RAFAEL PANIAGUA was wearing
what appeared to be an expensive gold bracelet that had not been
taken during the robbery.  When asked about this, JOSE RAFAEL
PANIAGUA told Detective-1 that during the altercation, he hid
the band under his sleeve.

c.       During his canvas of the Joaquin Grocery
after the shooting, Detective-1 saw in plain view on the counter
by the cash register an open cigar box with more than $100 in
cash inside.  Detective-1 also found four cellphones at the
Joaquin Grocery that appeared to have been smashed.

d.       JOSE OSVALDO PANIAGUA SR. told Detective-1
that the robbers had ripped the store's security camera out and
taken it with them.  JOSE OSVALDO PANIAGUA SR. also stated that
the robbers had taken the cellphones of everyone in the store
and smashed them.

32.  Based on my training, experience, and
participation in this investigation, including as detailed
herein, I believe that the unknown perpetrators who robbed the
Joaquin Grocery on that day and shot JOSE OSVALDO PANIAGUA SR.,
a/k/a "Nano," a/k/a "Viejo," the defendant, either did steal or
intended to steal prescription drugs and prescription drug
proceeds from the Joaquin Grocery that day.

33.  In April 2014, I met with a confidential source
for the NYPD ("CS").  The CS has previously provided information
to the NYPD in exchange for financial compensation, and the CS's
information has proven reliable and has been corroborated by
independent evidence.  The CS previously lived in the same

20

neighborhood as the Joaquin Grocery; has spent time in the Joaquin Grocery and knows it to be a location where individuals go to sell their medication; and told me that he/she has previously had discussions with JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," who he knows as "Tony," regarding the sale of prescription medication.  On or about April 22, 2014, I equipped the CS with video and audiorecording devices.  I then conducted surveillance of the CS as he/she entered the Joaquin Grocery.  Based on my review of the video recording, my review of a transcript of the recording that has been translated from Spanish to English, and my discussions with the CS, I learned the following:

                a.     When the CS entered the Joaquin Grocery, JOAN TORRES, a/k/a "Ronco," was present.

                b.     The CS asked TORRES "Where's Tony," referring to JOSE OSVALDO PANIAGUA JR., and TORRES responded "No. Talk to me."

                c.     The CS responded "No, is that I wanted to ask him what you are buying here now man."  TORRES responded "Percocet, M-thirty, AIDs bottles."

                d.     The CS told TORRES that the CS had previously told Tony that he would bring him 190 Percocets.  TORRES told the CS not to do business with "Tony" but not to tell "Tony" that TORRES said that.

                e.     The CS asked TORRES how much he was paying for Percocet, and TORRES responded "Four dollars.  Four, four and a half."

                f.     After some more conversation, including with other store patrons, the CS left the Joaquin Grocery.

        34.     Based on my review of information provided by relevant databases, I know that none of JOSE CARLOS PANIAGUA, a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo," JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," JOSE OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a "Viejo," JOSE BORGEN-REYES, a/k/a "Benny," a/k/a "Benny Blanco," a/k/a "Scar," and JOAN TORRES, a/k/a "Ronco," the defendants, are now or have ever been licensed dealers or distributors of prescription drugs in New York.

WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of JOSE CARLOS PANIAGUA, a/k/a "Carlos," a/k/a "Carlito," a/k/a "Cee-lo," JOSE OSVALDO PANIAGUA JR., a/k/a "Osvaldo," a/k/a "Calvo," JOSE RAFAEL PANIAGUA, a/k/a "Rafaelito," JOSE OSVALDO PANIAGUA SR., a/k/a "Nano," a/k/a "Viejo," JOSE BORGEN-REYES, a/k/a "Benny," a/k/a "Benny Blanco," a/k/a "Scar," and JOAN TORRES, a/k/a "Ronco," the defendants, and that they be arrested and imprisoned, or bailed, as the case may be.

JAMES R. SIERPUTOWSKI
Special Agent
Federal Bureau of Investigation

Sworn to before me this   **JUN 1 2 2014**
____th day of June, 2014.

THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK