UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

     -v.-

OSVALDO PANIAGUA,

           Defendant.

15 Cr. 547 (ALC)

**Government's Sentencing Submission**

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Russell Capone
Assistant United States Attorney
    *Of Counsel*



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 16, 2015

**By ECF and E-Mail**

Honorable Andrew L. Carter
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re: United States v. Osvaldo Paniagua, 14 Cr. 547 (ALC)

Dear Judge Carter:

The Government writes in connection with the sentencing of defendant Osvaldo Paniagua (the "defendant" or "Paniagua"), scheduled to take place on September 25, 2015. As suggested herein, the Government believes that a sentence within the advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 24 to 30 months' imprisonment is reasonable and not greater than necessary to achieve the purposes of sentencing, and in particular to reflect the seriousness of the offense and promote deterrence.

**The Offense**

As reflected in the Presentence Report ("PSR") and Complaint, this case centers around the Joaquin Grocery, a bodega on Morris Avenue and 151st Street in the Bronx that for years was the epicenter of illegal prescription drug related activity in its neighborhood. For many years, the Grocery operated as a marketplace for Medicaid beneficiaries to sell their second-hand medication, including HIV medication and controlled substances such as oxycodone, for a profit, rather than take it for needed medical treatment. (PSR ¶ 20.) The Paniagua Family – of which the defendant was patriarch – ran the Grocery and the drug business inside of it, amassing large quantities of medication that they kept at various stash locations before redistributing it. (PSR ¶¶ 20-24.)

The oxycodone would be re-sold to drug dealers like any other controlled substance, so that it could ultimately be sold to addicts. The HIV medication, on the other hand, was significant because of its high Medicaid value, typically hundreds of dollars, even sometimes in excess of $1,000, per bottle. Medicaid patients, who obtained the bottles for free, would sell those bottles for fractions of their value at the Joaquin Grocery, and the Paniagua Family would then sell the bottles upstream to larger collectors, who would ultimately put the bottles into distribution streams that landed them back in pharmacies. These second-hand bottles would then

be re-dispensed to new consumers, and re-paid for by Medicaid or another insurance company. At some point along the distribution chain, the pharmacy labels depicting the patients' information would be removed, typically using lighter fluid, to remove any trace that the bottles had been previously dispensed.  In addition to constituting a fraud, the scheme is potentially dangerous to unwitting consumers of second-hand drugs, given that the bottles have been treated with hazardous chemicals, may have expired, and have been stored in improper conditions. (PSR ¶¶ 13-19.)

Osvaldo Paniagua's role in the scheme was to help his sons purchase bottles at the Joaquin Grocery.  (PSR ¶¶ 24, 29-30.)  To be sure, although he was once the owner of the store and worked there regularly, he did not play any leadership or managerial role in the conspiracy. Rather, his sons, most prominently Jose Carlos Paniagua and Jose Osvaldo Paniagua, ran the illegal business.  But Osvaldo Paniagua regularly participated in his sons' illegal business by collecting bottles from patients while he was working, knowing that they were being obtained unlawfully and without a license.  The parties have agreed that the loss amount – calculated by the Medicaid value of the bottles attributable to Osvaldo Paniagua's efforts – is between $400,000 and $1,000,000.  Given the value of the bottles at hand, this amounts to somewhere between 500 and 1,200 bottles of prescription medication over time.  While this was a small fraction of the prescription drug business done at the Joaquin Grocery, it was not insignificant.

For years, the Joaquin Grocery was, without a doubt, a scourge on its neighborhood.  It provided a venue for hundreds, if not thousands, of drug-addicted Medicaid patients to *sell* the drugs they needed to help them in order to *buy* the drugs that further hurt them.  It served as a hotspot for narcotics trafficking, both oxycodone and more traditional drugs sold by gang members who lived in the nearby housing projects.  And it fueled further acts of violence in a neighborhood already consumed by them.  As the Complaint describes, the Grocery, because it was a known drug spot, has been the victim of multiple violent robberies, including one that led the defendant to being shot in early 2014.  And the violence went both ways, as the defendant's own sons plotted to murder a rival prescription drug trafficker in 2010, who was in fact shot in the head just a few stores down from the Joaquin Grocery.  To be clear, the defendant was not a known perpetrator of violence.  But he was a regular participant in a lucrative and reprehensible business run by his sons that blighted its neighborhood for years.

On June 23, 2014, the defendant and most of his co-defendants were arrested.  Working in concert with the U.S. Attorney's Office and the Federal Bureau of Investigation, the New York City Law Department obtained a court order that day padlocking the Joaquin Grocery, the first step in permanently shuttering its doors.  The business is, thankfully, no longer.

**The Plea and Plea Agreement**

The defendant and his co-defendants were first indicted in September 2014 and charged with one count of conspiring to distribute oxycodone, and one count of conspiring to deliver adulterated and misbranded drugs and to engage in the unlawful wholesale distribution of prescription drugs.  In February 2015, the indictment was superseded to add two counts against the defendant's sons related to the October 2010 attempted murder described above.  The superseding indictment did not alter the charges against the defendant in any way.

On June 5, 2015, the defendant pleaded guilty before the Honorable Frank Maas to Count Two of the Superseding Indictment, and specifically to the object of the conspiracy related to the unlawful wholesale distribution of prescription drugs.  The defendant's plea was pursuant to a plea agreement with the Government.  In the plea agreement, the parties agreed that the base offense level pursuant to U.S.S.G. §§ 2N2.1(c)(1) and 2B1.1(a)(2) was 6, and that a 14-level enhancement was warranted as a result of the loss amount.  After acceptance of responsibility points, the overall offense level is 17, and, considering the defendant's lack of criminal history, the Guidelines range is 24 to 30 months' imprisonment.  (PSR ¶ 7.)  The PSR comes to the same range, and recommends a sentence of 6 months' imprisonment.  (PSR ¶¶ 54-63, p. 20.)

**Argument**

A sentence within the applicable Guidelines range is sufficient but no greater than necessary to achieve the goals of sentencing, and principally the need to provide just punishment, promote respect for the law, and foster deterrence.

As described above, the Joaquin Grocery for years had a toxic affect on its neighborhood, serving as an outlet for people to sell the noncontrolled medication they needed, a drug marketplace for controlled substances, and a hub for violence.  The defendant was by no means a leader or manager of the operation, and the Guidelines range he faces reflects that reality.  But the defendant was also not a minor player.  He worked at the grocery and regularly helped his sons conduct their illegal business by purchasing medication.  This was not an isolated event, either numerically or temporally.  It went on for some time, and resulted in the purchase of a large amount of valuable medication.  A sentence within the Stipulated Guidelines range, i.e., in the vicinity of two years' incarceration, therefore appropriately provides just punishment and reflects the seriousness of this offense.

Such a sentence would also promote deterrence, both for the defendant and, importantly, for others involved in the same illegal activity.  The Joaquin Grocery was surely not one of a kind, and a message should be sent to other small business proprietors in New York City that turning a legitimate business into a drug marketplace will have serious consequences.   A sentence without a component of incarceration, as requested by the defendant, would send the opposite and wrong message.

The defendant's request for a sentence below the Guidelines range – and one without any term of imprisonment at all – is premised largely on the defendant's age, health, lack of criminal history, and role in the offense.  But while these are pertinent factors for the Court, they are not remarkable, or at least sufficiently serious to merit a variance.  The BOP is sufficiently well equipped to handle the incarceration of a 66 year old man with Parkinson's disease; while the disease is of course serious and unfortunate, there are ample prisoners with yet more serious conditions in federal custody.  Nor is the onset of Parkinson's a reason to remove incarceration entirely from the punishment imposed on the defendant.  Indeed, he continued to commit the crime at issue despite this condition.

With respect to the defendant's lack of criminal history and lesser culpability relative to his sons, both of these are accurate.  But they are also belied by the fact that this was not a one-time or isolated crime.  That the defendant was never previously convicted of a crime, and that

he was less culpable and active than his sons in this scheme, should be counterbalanced by the fact that the defendant did engage in the conduct at issue numerous times, over a lengthy period, in a way that continuously benefited his son's illegal and reprehensible business. The Guidelines range called for by the plea agreement correctly and reasonably takes all of this into account.

**Conclusion**

For the foregoing reasons, the Government submits that a sentence within the Guidelines range of 24 to 30 months is sufficient but not greater than necessary to meet the purposes of sentencing.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: /s/ Russell Capone
Russell Capone
Assistant United States Attorney
Southern District of New York
(212) 637-2247

cc: James Darrow, Esq. (by ECF and e-mail)